The next case for argument is 15-1777 E.I. du Pont v. MacDermid May it please the Court, with respect to the 859 patent, which is the major zone of controversy between the parties here, we contend that summary judgment was inappropriate because there were genuinely disputed facts with respect to at least four points, and those included whether the poor performance of thermal development with analog plates dissuaded its use with the more detailed digital plates. Secondly, whether doubts over the ability to thermally patented use of thermal development. Third, whether the six-year delay between publication of digital imaging and any attempt to use it with thermal development permitted at least an inference of non-obviousness. And lastly, whether the ability of the 859 patented invention to attain results as good or better than you can with solvent development was unpredictable and an unexpected result, again, justifying an inference of non-obviousness. Okay, you've raised those, I'm not sure I see those points exactly as you did, but talking to what I understood was your first point. Firstly, the stage is, so we all agree, you've got digital and you've got analog imaging, and then you've got four potential developmental, and we're talking here about thermal and solvent, really, so you say, well, there were problems with the thermal development used with analog, but weren't, doesn't the record really demonstrate quite clearly that those problems were a result of the problems with analog and not necessarily with the thermal development piece of that, right? The problem was that the technology, the existing technology of the day, where the thermal development technique had been proposed and where people had tried to make it work and it failed was all analog technology. And that technology was there from 1966. DuPont invented it and published that in 1966 purporting to lay out the benefits of avoiding solvents and toxicity and whatnot. And when digital imaging came along, published in 1993, the market forces that the district court said it was relying upon were all in place, and nobody even raised the issue, not just immediately, for years. And there's a reasonable reason for that. We're talking about six years. The long-felt need here is six years, which seems kind of on the low side from what we're usually hearing, right? I mean, digital didn't come into being, as you suggested, until 1993. It's not quite just long-felt need. It has to do with the fact that the market forces that the judge said would have driven this combination were there. The world was exactly the same in 1993 when digital was published as it was in 1999 when DuPont made this invention. And those market forces, if they truly motivated that combination, there's a reasonable inference here, and that's what we're talking about on summary judgment, a reasonable inference that there were some things that dissuaded people from doing it. And we've enumerated a number of things that the evidence clearly supports. Nobody was able to make the thermal development work, not DuPont, not 3M. There's a very interesting public article at page A6145. It's a McDermott memo. It lays out the history of thermal development. Published in 1966. DuPont never did anything with it. 3M took it up. There's a very interesting point there that in 1995, 3M announced that it was going to soon introduce a dry process that could be done in an office environment, and McDermott notes it never happened. The history of thermal development was a history of unfulfilled promise. No, I know, but you're not looking back to 1960, because what we're talking here is about the combination of digital imaging with thermal development, and the starting date for that being a possibility, obvious to try, or obvious combination, moves up only in 1993 when digital imaging comes on the scene. That's absolutely correct. And the whole idea of digital imaging, the problem with the use of thermal development with solvents was it actually degraded the image. The images weren't nearly as good as if you developed them with solvent. And the digital plates, the whole thing was completely fine imaging with the digital plate. But there were problems with solvents, too, right? The only problems with solvents were the safety and handling issues, which were noted in 1966. And the time it took to dry the product. Indeed, which were also noted in 1966. All of those benefits of solvent development were well reported if anybody actually could have made it work. And the idea that you would take a developing process that was known to degrade even an analog image and use it with an explicitly detailed new technology is absolutely counterintuitive. And the notion that what they found, and what they found was that with the digital imaging, the thermal development actually gave images as good or better than the solvent development of the digital images. But there were problems. There's a very, very small number of solutions. And there's a problem. And once you find, once digital comes on the market and becomes available in 1993, there are advantages of digital over analog, right? In imaging. In imaging. And then there are advantages over solvent of thermal. So if you've got those narrow number of choices, and we've got an obvious to try combining them, I guess what's your best argument that would have dissuaded one skilled in the art from saying, well, you know, there are problems with analog that were better with digital. So there's a reason to move to digital from analog. And there are problems with solvents that are remedial with, remediable with thermal. Given this small number of solutions, of options, what's your best argument for why one wouldn't have done that? Because the benefits of thermal were all theoretical. They had been unable to make those benefits actually come true from 1966 until 1999. Well, they were using thermal with analog. And it didn't work. That's exactly what we're trying to make. The reasons it didn't work, weren't they mainly, at least in my read of the record, dealing with problems that inured to the analog piece of it, not because of the thermal piece, right? It was the invention. Which would, in fact, then be the reason that they were motivated to move from analog to digital, not the reason to be dissuaded, right? It was the invention of the 859 patent that, in fact, you could solve the problems with analog imaging by using digital imaging, when it was absolutely counterintuitive to then use a less refined development method for that new refined technology. Mr. Lipsky, I want to ask you about the other patents, 758 relating to plant construction, which included the annealed aspect. Annealed is all over the patent. Absolutely. For example, it's in the prosecution history. Why wasn't it in the trudge correct? Unquestionably, the preferred way of making the product, the patent claim was to a thing, the product. And the law requires the disclosure of only a single method of making a product. That's the in vitro case we cited. And the claim nonetheless covers the product however made. And we cite cases where it's clear that you don't read process limitations into product claims unless there's an unambiguous disavowal of claim scope. And the trial judge, we contend, led into error by McDermott, misunderstood the arguments that were made during prosecution. The argument that was made during prosecution... But doesn't the word annealed describe the product in part rather than just the process by which it was made? The construction the court adopted was much more severe than saying annealed. It said in a special annealing process that was conducted before the bonding process. There was a whole line of process limitations that were written in there. But to directly answer your question, the answer is no. The property that... The word annealed doesn't appear in the claim. The property of the thing that's patented is a dimensional stability. And the patent taught how you could do that. You could do it by annealing. And the issue that the patent office raised, they said, well, that limitation's inherent. But the burden, of course, is on the patent office to support that. And one of the ways that the old case of In re Best allowed them to do it was by saying, look, it's made by the same process. And so the rebuttal to the inherency argument, it was twofold. One was, the things you're showing me aren't made by the same process, so you can't rely on that to show inherency. And secondly, really what the examiner was arguing was that all polyethylene terephthalate films met that limitation. And the applicant said, look at my example. Some do and some don't. And when that went to the board on that legal issue, they said, you're right. The examiner has not borne his burden of proof on the issue of inherency. And the rejections were reversed. It was not at all a disavowal of claim scope that things, plates that had the dimensional stability that had been discovered were not covered if they were made by some other method. The statements seem quite clear. I mean, in the PTAB opinion that resolved this and granted the patent, the conclusion is because the prior art references did not include an annealing process, they did not inherently disclose the claim thermal distortion. The magic word is inherently. That's the point. It was a rebuttal of an inherency argument. And In Re Best makes clear that's one way you can rebut an inherency argument. And the examiner needed something else to support that. And he didn't have it. And that's why the case was reversed. I mean, that's the classic argument that is made to avoid inherency. Maybe I'm not understanding. Yes, but we're dealing with whether or not it was the basis for the allowance was that the prior art did not include the annealing process. And you called it, in your term, a critical annealing step. The cases are legion with disclosures that describe the preferred method of making it as important and things like that. And we're not suggesting they don't. Yeah, well, we were talking about the basis for allowance. The claim simply said it had a specific dimensional stability. And it was the absence from the prior art of that dimensional stability that caused the claim to be allowable. The examiner had alleged it was inherent. The examiner had failed to prove that. Presumably, if it is inherent in some of that prior art, presumably my brother here has an inherent anticipation defense when we finally get to trial. But there certainly wasn't any disavowal of claims. Mr. Lipsey, let's go back for a minute to the 859 patent and the obviousness problem. Certainly. Do I understand, and I very well may not, that the basic technology that was being used was found in the FAN 275 patent? The imaging technology. The imaging technology. Yes. Would it be fair to say that the issue of obviousness is whether it was obvious to try to expose that FAN 275 patent process imaging layer to heat such that the layer would be thermally removed? Is that a fair statement? Not quite. Not quite. With a reasonable expectation of success. With a reasonable expectation of success. And the fact that solvent had been, or excuse me, that thermal had been such a disappointment with analog imaging, and in fact never had worked. And the fact that there was doubt about whether that laser ablingable layer on the top could be thermally removed, if you take a look at Dr. Catmack's report, obviously could be so. Obvious to try always assumes, doesn't it, a reasonable expectation of success. And if you're using obvious to try in the KSR sense, it says obvious to try things with predictable success. There is always an obviousness, a requirement for a reasonable predictability of success. Otherwise, everything is obvious. It's obvious to try anything. Did that issue get developed below? We repeatedly argued. Without too much heat. I'm sorry. We argued that case a month ago. Just to be clear, the already existing digital plates at the time of the invention had ablation layers that were thermally removable, right? That was what part, well, some did and some didn't, and that's an important point. But they were. I'm not saying every digital. But that already existed in the arts, right? That was unknown, and that was part of the invention that Roxy Fan made here. Well, there's lots of sites in the record that show that this was already in the art. The DPU plates, the DPL plates, I mean, there are lots of sites in the record that showed that there were already existing plates that had ablation layers that were thermally removable. There were existing plates. They were in the art. The DuPont scientists discovered that some could be developed and some couldn't. If you look at A4252, you'll see that the BSF plate couldn't be developed, the Asahi plate couldn't, and one of DuPont's was the worst. Some could. Some couldn't. That's part of the invention. That's not in the prior art. And there was substantial doubt that what does not in the prior art, the fact that those ablation. Some could, but some couldn't? I don't know. The fact that any could be removed by thermal development. The standard LAMS layer, standard laser ablatable layer, had 33% carbon black in it. That's a high level of filler. And as you can tell from paragraph 259 of Dr. Cagmack's report, he points out that such high fillers were known to create and alter the rheology and flow properties, and he pointed out that in the 471 patent, they limited the amount of filler to 5%. And the high viscosity of the laser ablatable layer seemed inappropriate for thermal development. And your honor, the fact that nobody did it, for six years, nobody even suggested doing it until DuPont did, permits an inference that there was a reason for that. And we've got evidence of what that reason was. The solvent thermal processes didn't work. Even McDermott, in the area quoted in paragraph 313 of Dr. Cagmack's report, they testified that that original solvent thermal device that DuPont worked performed poorly to the point that they abandoned efforts to adopt analog thermal. I'm sorry. I'm sorry. We've exhausted your time. Will we spare a few minutes? Okay. Thank you.  Good morning. May it please the court, my name is Sean Horvath, I'm here on behalf of McDermott. The district court properly entered summary judgment with respect to the 859 patent. She properly concluded the asserted claims, all of them, are an obvious combination of two known technologies, digital and thermal, without any change in prospective function. Specifically, in the record, there's undisputed evidence about the level of ordinary solid art. It's high and undisputed. And specifically, it's a high level of education of B.S. in chemistry and chemical engineering. Can you help me out with the last point we were covering with Mr. Lipsy, which is there is lots of suggestions, but the language is kind of squishy, particularly in gray, but the suggestion that the ablation layers that were thermally removable didn't exist, or weren't used, or that there's a strong teaching away, can you kind of deal with that? I can. So the claim language, first of all, with respect to step 1A, does not require a carbon black or any level of carbon black. If you look at it, it generally requires an infrared absorbing material, a radiation opaque material, and at least one binder having a softening or melting temperature less than 190. Those elements can be met by dyes, they don't have to be met by carbon black, so that's my first point. Second point is when it calls out and requires one binder having a softening or melting temperature less than 190, that includes nearly all ablation layers which were known in the art. And let me go through that carefully with you. So specifically, in the 859 patents, if we look at claim 22, which specifies some of the appropriate binders, the first callout is a polyamide, and the examples of the 859 callouts, specifically one, macromelt 6900, that was used in the prior arts and disclosed in the prior arts in the 330 publication, specifically in example 1, appendix 2019, that additionally was disclosed by McDermott's patent in the 500 patent at example 1, appendix 4204. The other binders which were included in the prior art include ethyl cellulose, the 275 patent describes it at 2424 of the appendix. And thirdly, and these are just examples, your honor, hydroxyethyl cellulose was described in the 330 publication as well at 2015. And so while not all conceivable ablation layers in the world, the predominant ones disclosed in example 1 of the 330 publication, example 1 of the 500 patent, were the exemplary ones. Macromelt 6900 was in fact used in DPU, and I note, for your honor, and you know, there are concessions below that the DPU plates and the CVU plates, the commercial plates which were digital, met steps 1A and 2 of the patent, and further that thermal development means as described in the 072 patent, the 761 patent, 471 publication, met step 3. And so the question is one of combination, as your honor indicated, there are very few options, and the art explicitly taught this particular combination, specifically, at 3427 there's an article in Converting Magazine which indicated that digital... What is the date of the article? January 2000, which is before the critical date, March 6, 2000. And it described that digital would become standard for high quality flexo, and it further went on to say that they see trade shops, excuse me, that regular or digitally imaged plates are processed without solvents or liquids. And so they're describing SIREL fast, and saying that digital was going to be combined with thermal, in the prior article. Thank you. I'm going to shift gears a bit to the secondary considerations, and that is, here on summary judgment, even accepting that on an obviousness to try, there's a relatively strong prime of basic case of obviousness. Why is it not a problem that we've got these secondary considerations, particularly the commercial success and the invention thing, or the award thing? The award thing. The award thing, okay. That the district court seemed to discount. Now, why aren't there enough factual issues surrounding those secondary considerations to say, well, maybe that ought to drive us to say there's a problem with summary judgment here, because she discounted them. She seems to have made factual decisions with respect to those. Well, okay. It's unquestionable that a required nexus is the burden of the patentee under this court's precedent. Further, this court precedent, the Supreme Court has said, when you have very compelling and strong for a prime of basic case, it only... Well, nexus, though, is usually dealing with the product when you've got 1,400 patents in an Apple phone, and you want to say, and you're talking about one out of those 14, so you want to show some nexus that that drove that. This isn't that kind of thing. The invention was really pretty much... The product pretty much captured what we're talking about here, right? In essence, it did, but it combined digital, which was described by the Digital Difference article as astounding and the best of the best, and thermal was described by DuPont itself at the trade show as revolutionary and breakthrough technology. But the district court discounted sales, saying it didn't show profit, but success is shown by sales. Profit is a complicated question involving costs, but sales indicates success. I agree with Your Honor. The difficulty with their proof, and it's one affidavit, remember, it's the Zoli affidavit, it's at 10,750, is that it only showed total sales over a very long period of time, 2000 to August of 2006, and those sales were $90 million. It only showed annual sales for the year 2005 of $25 million, and for the years, what they did is they did growth rates for the claimed invention product, and when you do that, and you start from zero, your growth rates are huge. What about market share? Market share is important, right? Oh, absolutely. And here, the record showed unquestionably that they had 85% of this particular market. And so market share would undercut whatever proof they had, but I guess my point is that the evidence of commercial proof is weak. If they had 85% market share, it sounds like they're dominating the market for that kind of product, which is commercial success. I apologize. Maybe I gave a bad answer. So for digital solvent, before they began commercializing digital foam... They had 85% before the invention, which you're trying to tell us. That's what I tried to say, and I said it poorly. So before they commercialized the invention, they had 85% of the market already, and so it was easier for them to convert. And I know... Isn't the question of whether the particular invention accounts for all of these secondary considerations, isn't that a question of fact that needs to be explored? I don't think so, Your Honor. Why not? Because I think in the overall analysis, the Graham factors ask the question, are the first three undisputed, and then is there an apparent reason to combine? And certainly secondary factors inform that, but it's a legal draw for the court and the corporate law, and De Novo for you here, to determine whether the evidence here of commercial success undercut that reason, an apparent reason to combine. And so further, on this affidavit, remember, it's one affidavit... What you're saying is they can't show a significant growth in market share after this came online. That's right. And the affidavit itself says that market acceptance was not immediate. So it wasn't an immediate hit. They had to spend considerable time and effort educating customers. In other words, they had to do a lot other than the invention to sell it. And then it says only over time with those efforts did they only acquire 13% of the market after six years of extraordinary effort. And you're right, the district court said the numbers do little, but that's because they had 85% of the market before the claim... In other words, they dropped from 85% to 13%? For the 13% is for the digital thermal only. 85% was for digital solvent beforehand. And further, the evidence shows that they had to use special marketing techniques for this particular thing, because digital solvent plates, without any change in the wall, were going to work in the thermal processor. You're making the argument that whatever the market need, it was not obvious to the market. Is that your point? But my point is that they needed to use special marketing techniques to drive their commercial success. It wasn't the invention. Before your time runs out, I wanted you to address the 758 patent and your friend's arguments with respect to inherency and how that... I didn't understand my friend's argument totally, because it doesn't make sense to me. The point is that there were rejections before by the examiner in order to overcome them. They emphasized innumerable times that the difference between the claimed invention and the prior art was that they used an important annealing step. It was a critical annealing step, and that they needed to use this further treatment by annealing to get the results that they claimed. They further said that the claimed invention in response to an enablement rejection was demonstrated by examples three and four, and as your Honor indicated, all of the examples highlight the key distinguishing feature in the examples is this special annealing step. Further, as your Honor noted... But the patent says may. It doesn't say must. If it were just the patent and the absence of prosecution history, would you agree that this is not a sufficient disclaimer? I would agree that it would be a very close case. Remember that the patent also describes this as a discovery. They noted a problem with the distortion. The special annealing was their discovery, and then they highlighted throughout making key distinctions between non-annealed and annealed substrates and plates. I think it would be a very close call. Fortunately, we don't need to go there, because as your Honor noted, the board itself relied on the argument of annealing to allow these claims in the first place. It must be a requirement of the claims, otherwise we wouldn't have been here in the first place. And here it's undisputed. We do not anneal. We've never annealed. We dry glue on a substrate for bonding purposes. It's further undisputed that we tested the substrate before the glue drying and after the glue drying, and it did absolutely nothing to improve or control the dimensional stability of our substrates. Further, the evidence is undisputed that when you thermally develop one of our completed plates at a high end of the range, at 170, 179, they distort too much. They distort beyond the claimed range. And so here, I think it's clear that we don't infringe because we don't anneal, and we don't infringe because there's no proof that we meet the subsequent requirements of 0.03% or less in both directions. But that depends on whether annealing is a required part of the claim, I'm sure. It's actually separate, Your Honor. So there were two arguments made, and I agree, the district court only went to the first one, the annealing issue. But we presented proof, which is undisputed, that our plates at 170, 179 do not infringe the latter part of the claim. Specifically, after thermal distortion, our plates distort in one of the directions more than 0.03% when exposed and developed at 170 and 179. So between the temperatures of 100 and 180 degrees Celsius. And so this is a separate independent basis for doing that. So you win either way. Exactly, Your Honor. So with that, if you have any questions, there's at least eight, five, nine patents? No? Thank you, Your Honor. The court has been very patient. I know I've overstayed my welcome. But to make no mistake, nobody thermally developed a digital plate before DuPont did. Notwithstanding that that technology was there. And while they discovered that some could be developed, that was part of the invention and not part of the prior art. It is correct that we have evidence that we contend establishes a number of objective criteria, including evidence of unexpected results. There's evidence that the ability with digital thermal to actually get images as good as or better than the solvent development was unpredictable and unexpected. We have commercial success. We have industry praise. We have copying. The details of that copying. You think you would fare better at a trial on that question? I think, well, here's where we come in the end. We're dealing here with a KSR type of business case. The more enlightened cases dealing with this issue, like Plantronics and the Mintz case that we cite, acknowledge that when you're dealing with one of these soft motivational issues, like common sense or market forces, that you have to be very careful to avoid the effect of hindsight. And it's very important to carefully look at the objective evidence of non-obviousness to keep from lapsing into hindsight. Because a determined advocate can make something look much simpler in hindsight than it was when people were there trying to do it. And we contend that to try to weigh this evidence, to weigh the evidence that there was a reason why people might have been dissuaded from using thermal, there was a reason why people might have been dissuaded from thinking you could develop off that abrasion layer, there were these other factors to weigh that evidence and decide, as a matter of law, that the invention is unpatentable, we think invades the province of the jury to draw reasonable inferences in favor of the patent holder. And the law, indeed the Constitution, requires that those inferences be preserved. And just to lastly deal with the point about the promotional literature, that was in an article announcing the introduction not of digital thermal, it was an article announcing that the thermal process was coming and it was limited to analog. Why? There clearly were problems in going on to the more refined digital development. Clearly the experts at DuPont were going to have to, in the minds of the person of ordinary skill in the art, figure out how to do it. And that, when you look at the articles, is in the future or on the horizon. There is nothing in there that suggests that the technology of the day was suitable for the development of digital thermals. Thank you very much. Thank you. We thank both parties and the case is submitted.